UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
AMMAR ABDO SAEED SALEH,

                                    Petitioner,

                                                                    21-cv-10240 (PKC)

            -against-

                                                                    OPINION AND ORDER


UR MENDOZA JADDOU, Director of
U.S. CITIZENSHIP AND IMMIGRATION
SERVICES; ALEJANDRO MAYORKAS,
Secretary of the U.S. DEPARTMENT OF
HOMELAND SECURITY, SUSAN
QUINTANA, Field Office Director
U.S. IMMIGRATION SERVICES,[1]

                                    Respondents.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

            Ammar Abdo Saeed Saleh petitions this Court for judicial review of the denial of

his application for naturalization.  United States Citizenship and Immigration Services

("USCIS") denied Saleh's application because it determined that Saleh lacked good moral

character and that he was not a lawful permanent resident.  The parties—Saleh, petitioner, and

three government officials with responsibility for enforcement of the immigration laws,

respondents—have each moved for summary judgment.  The certified administrative record has

been filed with the Court, and respondents have submitted declarations from two immigration

officials who interviewed the petitioner.  Saleh has not submitted any evidence of his own from

outside the administrative record.

---

[1] In a confusing manner the caption lists the last name of each office holder before their first name.  In addition, Ms.
Quintana is now Director of the New York Field Office.  The Clerk shall amend the caption as indicated above.

The Court will grant respondents' motion.  Upon de novo review, the Court concludes that no reasonable factfinder could find that Saleh had proven his "good moral character," as statutorily required.

BACKGROUND

Except as otherwise indicated, the following facts are drawn from the Certified Administrative Record ("CAR") (ECF 21-1 through 21-33.) and the Certified Electronic Record from his administrative appeal ("CER") (ECF 21-35, -36.).[2]

Saleh, a Yemeni citizen, married Najat Abdullah Al Shraei in Yemen on March 10, 1989.  (CAR 43, 438.)  On December 18, 1992, Saleh entered the United States on a visitor visa.  (CAR 113.)  After a few years living in separate countries, Saleh and Al Shraei divorced in 1994, with Saleh's brother acting as his representative in Yemen.  (CAR 439.)

Saleh married his second wife, Tysha Suzette Brewton, a U.S. citizen, on August 4, 1995.  (CAR 173.)  The couple had one son, Walleed Saeed, born in January 1997.  (CAR 159.)  In July 1996, Brewton filed a Form I-130 Petition for Alien Relative on Saleh's behalf (CAR 944–51.), and Saleh filed his own Form I-485 adjustment-of-status application, (CAR 877–85.).  Saleh indicated on his application that he had never previously been married.  (CAR 883.)

In June 2000, Brewton withdrew her petition.  (CAR 1082–84.)  According to a letter from Brewton, Saleh had revealed to her that, at the time of their marriage, he had been married to another woman in his home country of Yemen, which Brewton understood to mean her marriage with Saleh was "void."  (CAR 1083–84.)  As of June 2000, Brewton believed Saleh

---

[2] Neither party contests the factual accuracy of the CAR and CER, framing this appeal as only raising legal issues and urging the Court to draw competing conclusions.  (See, e.g., ECF 33 at 2, ECF 37 at 7 n.1.)

to be in Yemen living "with his wife and newborn." (CAR 1084.)  Her letter also accused Saleh

of "continuously" submitting "phony documents" to the Immigration and Naturalization Service

("INS"), the predecessor to USCIS, and of using her address in New York rather than his own

address in Ohio.  (CAR 1083–84.)  The couple divorced on January 2, 2002.  (CAR 43, 726–28.)

On January 25, 2002, Brewton filed a new Form I-130, and Saleh filed a new

I-485 application for status as a lawful permanent residence.[3]  (CAR 814–1, 861–62.)  In his

application, Saleh identified Brewton as his spouse and stated he had only one child.  (CAR 814,

816.)  Five days later, on January 30, 2002, Brewton submitted another letter, this time

requesting USCIS "stop all process" on the new I-130 petition because Saleh and she were "no

longer married."  (CAR 997.)  Brewton described that in late 2001 Saleh confessed that in 1999

he had married yet another woman in Yemen, Wayda Abdo, and that he had a child by Abdo.

(CAR 997.)  Brewton also claimed that Saleh had absconded with her own personal documents,

and she warned of those documents being used "to act as if they are me" or being used "without

my knowledge."  (CAR 997.)  USCIS denied Saleh's second adjustment-of-status application on

December 8, 2003.  (CAR 811.)

The parties agree that at some point Saleh married Abdo in Yemen, though the

exact dates of marriage and dissolution of the marriage are in dispute.  As indicated above,

during her own marriage to Saleh, Brewton expressed to immigration authorities her belief that

Saleh was also married to Abdo at the same time.  And as discussed below, Saleh himself—both

during his third application for adjustment of status and in a naturalization interview—informed

USCIS that he divorced Abdo on December 6, 2001, less than a month before he and Brewton

---

[3] Though it is not necessary to make any findings on this point, the Court is skeptical of the provenance of these documents.  The signature on the Form I-130, ostensibly filed by Brewton, appears to have been signed by Saleh, with his—not her—phone number listed.  (Compare CAR 818 (Saleh and Brewton's signatures and phone numbers on the Form I-485) with CAR 862 (signature and phone number on Form I-130).)

were divorced.  (CAR 113, 231, 334, 723-24.)  But Saleh currently asserts that the original

overlapping dates he provided stemmed from a transcription error and that he was instead

married to Abdo from June 2002 to December 2003, wholly after the conclusion of his marriage

to Brewton.  (CAR 43.)  Regardless of the correct dates of the marriage to Abdo, it is undisputed

that Saleh had two children in Yemen with Abdo while married to Brewton: Amar, born May 27,

2000, and Aliah, born June 26, 2001.  (CAR 160, 163.)

 Saleh married a fourth woman, Belkis Garcia, a naturalized U.S. citizen, on June

30, 2005.  (CAR 174.)  On October 16, 2008, Garcia filed a Form I-130 on Saleh's behalf, and

Saleh submitted his third I-485 adjustment-of-status application.  (CAR 330–33, 713–14.)

Garcia listed Saleh as having only one previous marriage, that to Brewton—no reference was

made to his marriages to Abdo or Al Shraei.  (CAR 713.)  Significantly, in his own application,

Saleh also indicated that he had only one child and one prior marriage.  (CAR 331, 334–35.)  In

an interview on February 23, 2009, however, Saleh amended his application to include his

marriage to Abdo.  (CAR 330, 334.)  He provided documentation from the Republic of Yemen

showing that he divorced Abdo on December 6, 2001.  (CAR 326, 334, 723–24.)  He did not

mention his two children by Abdo or his marriage to Al Shraei.  (CAR 331, 334.)  USCIS

approved Saleh's application for permanent status on March 24, 2009.  (CAR 113, 177.)

 Saleh and Garcia divorced on July 13, 2012.[4]  (CAR 79–82.)  Three days later, on

July 16, 2012, Saleh filed an N-400 application for naturalization based on his marriage to

Garcia.  (CAR 210–20, 234.)  Unlike his 2008 application for adjustment of status, the N-400

application listed all three of his children; however, the application listed only three marriages,

---

[4] As discussed below, while a judgment of divorce was signed on this date, there is some dispute over when the divorce became "final."

not four, omitting his marriage to Al Shraei.  (CAR 214, 216, 231.)  In response to the question,

"Have you **ever** given false or misleading information to any U.S. Government official while

applying for any immigration benefit or to prevent deportation, exclusion, or removal," he

answered "No."  (CAR 218 (emphasis in the original).)

On February 25, 2013, Saleh sat for an interview in connection with his N-400.

(CAR 234.)  The interview proceeded under oath, and during the interview he affirmed that the

information on his N-400, inclusive of any corrections made during the interview, was correct.

See 8 C.F.R. § 335.2(c) (applicant to be questioned under oath or affirmation).  (CAR 220.)  His

application contains hand-written checkmarks next to the questions where Saleh orally

reconfirmed that he was "now married" to Belkis Garcia and that he had been living with her for

the prior three years.  (CAR 210, 214.)  The interviewing officer states that the checkmarks

indicate "that Mr. Saleh reaffirmed during the interview the answer he gave on his naturalization

application."  (Declaration of Judith C. Carty ("Carty Dec.") ¶ 6.) (ECF 24-1.)  Saleh also stated

in the interview that he was married to Abdo from January 20, 1999, through December 6, 2001.

(CAR 231; Carty Dec. ¶¶ 8–9.)  After the interview, USCIS requested additional evidence

regarding the claim that Saleh had been married and living with Garcia for the prior three years.

(CAR 177, 584.)  Saleh did not respond to the request, and the application was denied on May

18, 2013.  (CAR 176–78.)

Saleh married his fifth wife, Shawn Sanderson, on May 10, 2016.  (CAR 127.)

On October 25, 2016, Saleh filed his second N-400. (CAR 119, 121–40.)  On his

application he stated that he had been married four times and that he had three children.  (CAR

127–31.)  In response to the questions, "Have you **EVER** given any U.S. Government officials

**any** information or documentation that was false, fraudulent, or misleading?" and "Have you

**EVER** lied to any U.S. Government officials to gain entry or admission into the United States or to gain immigration benefits while in the United States?," he answered "No."  (CAR 135 (emphasis in original).)

On May 10, 2018, Saleh sat for an interview in connection with this application, and he testified under oath that all the information contained in his application was true.  (CAR 114, 139.)  The application was initially approved on August 27, 2018, and his naturalization oath ceremony was scheduled for September 21, 2018. (CAR 121, 142.).  On September 20, 2018, however, USCIS sent Saleh a notice that his oath ceremony had been cancelled "due to unforeseen circumstances."  (CAR 512.)

On January 2, 2019, USCIS moved to reopen his 2016 naturalization application, seeking additional information on Saleh's marital history and marital status.  (CAR 119.)  USCIS was concerned that while Saleh claimed four marriages on his N-400, he had only provided information about two of those spouses.  (CAR 119.)  In reviewing his administrative record—which included the overlapping dates he had previously given for his marriages to Brewton and Abdo—the agency determined that he had not been lawfully admitted for permanent residence. (CAR 119.)  USCIS required Saleh to provide "marriage certificates for all four spouses and proof of termination of ALL [his] previous marriages, and birth certificates for ALL [his] claimed children."  (CAR 119.)

In response, Saleh provided additional marriage, divorce, and birth certificate records.  (CAR 157–174.)  His submission included a translation of his Yemeni documents relating to Abdo, listing—for the first time—a marriage date of June 11, 2002, and now a divorce date of December 6, 2003.  (CAR 166, 168.)  The submission also included

documentation related to Sanderson, Garcia, and Brewton, but his submission made no mention of his first marriage to Al Shraei and supplied no documentation relating to that marriage.

On May 30, 2019, USCIS denied Saleh's 2016 application for naturalization, finding that he had "given false testimony under oath with the intent to obtain an immigration benefit by failing to provide the correct number of marriages and correct number children." (CAR 114.)  The decision highlighted the conflicting information he had provided regarding his marital history, in particular his marriage to Abdo, and also determined that because of his false statements, he had not been lawfully admitted for permanent residence.

On July 2, 2019, Saleh filed a Form N-336 request for a hearing on the denial of his naturalization application.  (CER at 41–49.)  In support of this request, Saleh submitted a letter stated to be from a police station in Yemen.  The letter explained that the divorce decree originally submitted by Saleh relating to his marriage to Abdo had "an unintended error in its date," and the year should have been listed as 2003, not 2001.  (CER 31.)

Saleh and Sanderson divorced on January 26, 2021, while his appeal was pending. (CAR 43.)  A hearing on the N-336 request was held on September 7, 2021.  (CER 58; CAR 139.)  At this hearing, Saleh for the first time disclosed his marriage to Al Shraei, and also disclosed that he had by then married for a sixth time.  He provided the following marital history to USCIS:

1. Al Shraei (March 10, 1989 until January 10, 1994);

2. Brewton (August 4, 1995 until January 2, 2002);

3. Abdo (June 11, 2002 until December 6, 2003);

4. Garcia (June 30, 2005 until July 13, 2012);

5. Sanderson (May 10, 2016 until January 26, 2021); and

6.  Ibtihal Abdul Rahman Muhammad (from May 16, 2021).

(CAR 43, 75.)

On November 1, 2021, USCIS upheld the denial of Saleh's application for naturalization.  (CAR 43–45.)  In a written decision, it found that Saleh had (1) failed to demonstrate that he had been lawfully admitted for permanent residence and that he had (2) given false testimony under oath with the intent to obtain an immigration benefit.  (CAR 45.) The decision explained that Saleh had repeatedly failed to provide an accurate marital history when filing applications for immigration benefits.  For example, he omitted his marriage to Al Shraei on every application prior to its disclosure at the 2021 hearing.  That omission also appeared on his 2008 application for his lawful permanent resident status.  (CAR 44.)  USCIS also questioned the veracity of the updated documentation regarding his divorce to Abdo.  (CAR 44–45.)

Saleh filed the instant petition in this Court under the provisions of the Immigration and Nationality Act ("INA") § 310(c), 8 U.S.C. § 1421(c), and has moved for summary judgment.  Respondents oppose the motion and have filed their own cross-motion for summary judgment.

DISCUSSION

I.       Statutory Framework, Including De Novo Review.

Congress has vested the Attorney General with the "sole authority to naturalize persons as citizens of the United States," 8 U.S.C. § 1421(a), and the Attorney General has "delegated that authority to USCIS," Rivera v. USCIS, 5 F. Supp. 3d 439, 441 (S.D.N.Y. 2014).

"The general naturalization statute, 8 U.S.C. § 1427, sets forth various conditions with which an individual must comply in order to be eligible for naturalization."  Boatswain v.

8

Gonzales, 414 F.3d 413, 416 (2d Cir. 2005).  Relevant here, applicants must first be "lawfully admitted for permanent residence," and they then must maintain continuous residence within the United States (1) for at least five years immediately preceding the date of the naturalization application and (2) during the interval between the application and admission for citizenship.  8 U.S.C. § 1427(a).  Where the applicant is the spouse of a U.S. citizen, "and during the three years immediately preceding the date of filing his application [the applicant] has been living in marital union with the citizen spouse," the requirement is shortened to three years of continuous residence.  8 U.S.C. § 1430(a).

During these periods, the applicant is required to "ha[ve] been and still [be] a person of good moral character."  8 U.S.C. § 1427(a)(3).  Determinations of "good moral character" are subject to statutory restrictions, including that "[n]o person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was . . . one who has given false testimony for the purpose of obtaining any [immigration] benefits."  8 U.S.C. § 1101(f)(6).  An applicant falling under this provision is subject to "a per se statutory bar to a finding of good moral character." Boatswain, 414 F.3d at 416.

Section 1101(f)(6) contains no materiality requirement, applying to "even the most immaterial of lies," but the false testimony must be "made with the subjective intent of obtaining immigration benefits."  Kungys v. United States, 485 U.S. 759, 780 (1988).  The purpose of the provision is not "to prevent false pertinent data from being introduced into the naturalization process" but instead "to identify lack of good moral character."  Id.  Section 1101(f)(6) therefore "singles out a specific class of lies . . . as a reason to deny naturalization," while "'willful misrepresentations made for other reasons, such as embarrassment, fear, or a

desire for privacy' . . . are not generally disqualifying."  Maslenjak v. United States, 582 U.S. 335, 345 (2017) (brackets omitted) (quoting Kungys, 485 U.S. at 780).

As used in section 1101(f)(6), "'testimony' is limited to oral statements made under oath" and "does not include other types of misrepresentations or concealments, such as falsified documents or statements not made under oath."  Kungys, 485 U.S. at 780 (internal quotation marks omitted); see Medina v. Gonzales, 404 F.3d 628, 637 (2d Cir. 2005) (holding "that false oral statements made under oath during an asylum interview constitute 'false testimony' within the meaning of 8 U.S.C. § 1101(f)(6)").

After filing an application for naturalization, the applicant must sit for an examination interview.  8 C.F.R. § 335.2(a).  At this interview, the "applicant shall be questioned, under oath or affirmation, in a setting apart from the public."  Id. § 335.2(c).  Where necessary, "the examining officer shall correct written answers in the application for naturalization to conform to the oral statements made under oath or affirmation."  Id.  Statements made under oath during this interview are "testimony" for the purposes of section 1101(f)(6). See, e.g., Kaibanda v. USCIS, 21 Civ. 5953 (JPC), 2022 WL 2195345, at *5 (S.D.N.Y. June 17, 2022) (finding applicant testified falsely by reviewing and affirming application answers under oath at naturalization interview); Rivera, 5 F. Supp. 3d at 442–43 (same); United States v. Cheboss, 22-2617, 2023 WL 5157752, at *5 (8th Cir. Aug. 11, 2023) (finding sufficient circumstantial evidence that applicant gave section 1101(f)(6) "false testimony" by ratifying application at the naturalization interview).

"It is well settled that in a naturalization proceeding the petitioner has the burden of proving his good moral character."  In re Yao Quinn Lee, 480 F.2d 673, 676 (2d Cir. 1973) (citing Berenyi v. District Director, 385 U.S. 630, 637 (1967)).  Any doubts are to be resolved

against the petitioner.  Id. (citing United States v. Manzi, 276 U.S. 463, 467 (1928)).  "In determining whether the applicant has sustained the burden of establishing good moral character . . . the Attorney General shall not be limited to the applicant's conduct during the five years preceding the filing of the application, but may take into consideration as a basis for such determination the applicant's conduct and acts at any time prior to that period."  8 U.S.C. § 1427(e).  Where an application for naturalization is initially denied by USCIS, section 336 of the INA provides that "the applicant may request a hearing before an immigration officer."  Id. § 1447(a).

If at this appeal hearing the application is again denied, the applicant may seek de novo judicial review:

> A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this title, may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of title 5. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

Id. § 1421(c).  As the Second Circuit has described, "this grant of authority is unusual in its scope—rarely does a district court review an agency decision de novo and make its own findings of fact."  Chan v. Gantner, 464 F.3d 289, 291 (2d Cir. 2006) (brackets and internal quotation marks omitted).  Nevertheless, although USCIS "is allowed to make the initial decision on a naturalization application, the district court has the final word and does not defer to any of the [USCIS's] findings or conclusions."  Chan, 464 F.3d at 291 (internal quotation marks omitted). "[T]he district court may rely on both the administrative record and facts established in the district court."  Kaibanda, 2022 WL 2195345, at *5 (citing Chan, 464 F.3d at 291).  The burden remains on the "applicant to show his eligibility for citizenship in every respect," and "doubts

11

'should be resolved in favor of the United States and against the claimant.'" <u>Berenyi</u>, 385 U.S. at 637 (quoting <u>United States v. Macintosh</u>, 283 U.S. 605, 626 (1931)).

      II.    <u>Summary Judgment Standard.</u>

          Summary judgment is proper when "there is no genuine dispute as to any material fact" and the moving party "is entitled to a judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "A genuine factual dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Truitt v. Salisbury Bank & Tr. Co.</u>, 52 F.4th 80, 85 (2d Cir. 2022) (quoting <u>Anderson</u>, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." <u>Delaney v. Bank of Am. Corp.</u>, 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks omitted).

          It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." <u>Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc.</u>, 575 F.3d 199, 204 (2d Cir. 2009). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must demonstrate more than some metaphysical doubt as to the material facts, and come forward with specific facts showing that there is a genuine issue for trial." <u>Powell v. Nat'l Bd. of Med. Exam'rs</u>, 364 F.3d 79, 84 (2d Cir. 2004) (internal quotation marks omitted). A court "may grant summary judgment only

when no reasonable trier of fact could find in favor of the nonmoving party."  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted).

"When both parties have moved for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  Dish Network Corp. v. Ace Am. Ins. Co., 21 F.4th 207, 212 (2d Cir. 2021) (internal quotation marks omitted).

The Federal Rules of Civil Procedure "apply to proceedings for admission to citizenship to the extent that the practice in those proceedings is not specified in federal statutes and has previously conformed to the practice in civil actions."  Rule 81(a)(3), Fed. R. Civ. P. The Second Circuit has concluded that Rule 56 is applicable to proceedings under section 1421(c).  Chan, 464 F.3d at 296.  Where there are no disputed issues of material fact, summary judgment is an appropriate means of disposing of a section 1421(c) petition.  Id.

III.     Petitioner Cannot Establish "Good Moral Character" Because He Gave False Testimony for the Purpose of Obtaining Immigration Benefits.

The Court concludes that summary judgment should be granted in favor of the respondents because on the summary judgment record no reasonable factfinder could conclude that Saleh has demonstrated his eligibility for citizenship in every respect.[5]  This conclusion flows from the incontrovertible fact appearing in the summary judgment record that he gave false testimony in endeavoring to obtain immigration benefits.

---

[5] As laid out above, section 1421(c) directs that the Court "shall make its own findings of fact" and that Saleh may request the Court conduct a de novo hearing.  Saleh has not requested a hearing and has instead moved for summary judgment on the record before the Court.  This record includes the CAR, the CER, and the declarations from the immigration officials who interviewed Saleh.  Saleh has submitted no evidence from outside this record, and he argues that "the record reflects that Plaintiff has met all of his requirements for naturalization."  (ECF 33 at 6.)  At various point in his memoranda of law, however, Saleh obliquely suggests the Court might make additional findings of fact in his favor.  (See, e.g., ECF 38 at 12 (". . . a trier of fact may find that that Mr. Saleh did not have the requisite mental state to willfully give false testimony.").)  Even were the Court to act as a finder of fact, the Court would conclude on the record before it that Saleh has not met his burden of demonstrating his good moral character.

Saleh filed his current N-400 application for naturalization on October 25, 2016. His claimed basis for eligibility is that he had been "a lawful permanent resident of the United States for at least 5 years." (CAR 121.) He was therefore subject to the good moral character requirement for that prior five-year period. That period includes the proceedings during his first, abandoned N-400 application, filed July 16, 2012. On February 25, 2013, Saleh sat for an interview regarding his 2012 naturalization application. Saleh does not dispute that this interview was conducted under oath, and he concedes that "[f]alse information [affirmed] orally under oath to an officer in a question-and-answer statement relating to a written application is 'testimony'" within the meaning of section 1101(f)(6). (ECF 38 at 10.) The record demonstrates that, during this interview, he gave false testimony by affirming false statements on the 2012 application. Because Saleh gave false testimony in connection with his 2012 N-400 application, he is ineligible for naturalization under his 2016 N-400 application.[6]

First, Saleh affirmed under oath that he had been married three times, not four. (CAR 214; Carty Dec. ¶ 5.) He argues that this statement was not false but simply reflects a misunderstanding: His first marriage to Al Shraei was, he claims, not a "legal" marriage, but only a "religious" one. But he has provided no evidence that his marriage was not valid under Yemeni law, and the claim is inconsistent with the rest of his application—Saleh did report to USCIS a second Yemeni marriage, that to Abdo, and he eventually provided documentation for the Al Shraei marriage that was of a similar type as he provided for the Abdo marriage. (Compare CAR 438–39 (Al Shraei marriage and divorce documents) with CAR 440–41 (Abdo marriage and divorce documents).) Saleh cannot on the summary judgment record meet his

---

[6] Because the Court concludes that Saleh has given false testimony during the statutory period, it need not evaluate the earlier examples of alleged false testimony or other evidence regarding a lack of good moral character.

burden of demonstrating "good moral character" because the record demonstrates that he gave false testimony in an effort to gain naturalization.

Wholly apart from Saleh's omissions regarding Al Shraei and his claim that he had no obligation to disclose what he considered to be a religious marriage, he also answered "No" on his 2012 application to the question "Have you **ever** given false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?" (CAR 218 (emphasis in original).) Again, this statement was affirmed under oath. But in his 2009 application for lawful permanent residence, he claimed to have only one child (CAR 331.), while in his 2012 naturalization application he claimed three children born before 2002, a statement that was also affirmed under oath. (CAR 216.) Both statements cannot be true. Either Saleh was required to answer "Yes" to the "false or misleading information" question on the 2012 application, or he was lying about his children on that same application. Either way, he gave false testimony in support of his naturalization application.

Saleh's false and deceptive testimony regarding his 2012 application also directly affects his 2016 naturalization application. On his 2016 application Saleh answered "No" to the question, "Have you **EVER** given any U.S. Government officials **any** information or documentation that was false, fraudulent, or misleading?" (CAR 135.) He affirmed this statement under oath during his September 7, 2021, N-336 interview. (CAR 135; Declaration of Veronica W. Yip ("Yip Dec.") ¶ 3.) (ECF 24-2.) The answer should have been "yes."

In addition to the false and misleading statements discussed above, Saleh's 2012 application—filed July 16, 2012—stated that he was "now married" to Garcia and had been living with her for the prior three years. (CAR 210, 214.) Saleh affirmed these statements under

oath.  (Carty Dec. ¶ 6.)  Despite these unambiguous statements, an "Uncontested Judgment of Divorce" between Saleh and Garcia had issued on July 13, 2012, three days prior to the filing of the application.  (CAR 79–82.)  The judgment stated that the relationship had been broken down irretrievably for a period of at least six months.  See N.Y. Dom. Rel. Law § 170(7).  (CAR 80.)  Saleh appeared in the divorce action.  (CAR 80.)  Saleh argues that at the time of his application and interview he was unaware that the divorce was final, but the record indicates he received a Notice of Entry of the divorce judgment in December 2012.  (CAR 86.)

   In his memorandum of law, Saleh endeavors to challenge the falsity of these statements by asserting that the divorce was not actually final until August 10, 2012.  (See ECF 33 at 4 ("On August 10, 2012, Plaintiff's divorce with Ms. Garcia was finalized."); CAR 86 (Notice of Entry stating judgment was "entered in this action on the 10th day of August 2012"); but see CAR 75 (Saleh confirming July 13, 2012, as the date of his divorce to Garcia; Yip Dec. ¶ 6.)  But there can be no question that the information provided was "misleading."  As of July 2012, Saleh had been a lawful permanent resident for fewer than five years, and therefore he was only eligible to apply for naturalization through his marriage to Garcia.  See 8 U.S.C. §§ 1427(a)(1), 1430(a).  He would have needed to remain married through his naturalization.  Id. § 1430(a) ("Any person whose spouse is a citizen of the United States . . . may be naturalized . . .") (emphasis added); see In re Yao Quinn Lee, 480 F.2d at 675 ("Because petitioner is not currently married to an American citizen [after his divorce], he no longer falls within the literal purview of section [1430(a)] and he is ineligible for naturalization under that section.").  Final at time of filing or not, if he had told the truth about his divorce, his application would likely have been denied.  See Petition of Bashan, 530 F. Supp. 115, 120 (S.D.N.Y. 1982) (denying petition under section 1430(a) where there "was a separation of long duration, which both parties intended to be

permanent").  Yet he proceeded to file an application and then sit for an interview under oath as if he was still married to and living with Ms. Garcia.  In context, Saleh's statements about his marital status in 2012 and 2013 were at minimum intentionally and highly misleading, if not outright false.  He therefore gave false testimony when he later affirmed that he had never given misleading information to government officials.

Saleh's remaining arguments are unconvincing.  He urges that even if the Court concludes that he made false statements when applying for immigration benefits, these statements were not material.  However, section 1101(f)(6) does not contain a materiality requirement.  Kungys, 485 U.S. at 780 (explaining that section 1101(f)(6) applies to "even the most immaterial of lies").  But to avoid any further doubt, the Court concludes that the false statements and omissions noted herein would have been important to a decision maker and thus were highly material to his application.  See Berenyi, 385 U.S. at 638 (explaining that the government "is entitled to know of any facts that may bear on an applicant's statutory eligibility for citizenship, so that it may pursue leads and make further investigation if doubts are raised"); see also Maslenjak, 582 U.S. at 349 ("[E]ven if the true facts lying behind a false statement would not in and of themselves justify denial of citizenship, they could have led to the discovery of other facts which would do so." (internal quotation marks omitted)).

Saleh also generally suggests that these false statements might instead have been given for benign reasons, such as "embarrassment, fear, or a desire for privacy."  Kungys, 485 U.S. at 780 (internal quotation marks omitted).  He correctly points out that his false testimony must have been given "with the subjective intent of obtaining immigration or naturalization benefits."  Id.  But in this proceeding Saleh has the burden of proof to demonstrate his good moral character, and any doubts are to be resolved against him.  See Berenyi, 385 U.S. at 637.  It

is insufficient for him to rest on mere speculation, particularly in context of the record before the Court.  His false testimony was made to immigration officials during and in furtherance of his efforts to obtain naturalization.  See In re Yao Quinn Lee, 480 F.2d at 677 ("In light of the fact that petitioner was seeking the privilege of citizenship and in doing so knowingly provided [INS] with material misinformation, the district court could properly conclude, despite petitioner's testimony to the contrary, that petitioner had the necessary intent."); Kaibanda, 2022 WL 2195345, at *7 (concluding that where applicant "denied ever giving false, fraudulent, or misleading information . . . his objective of course was to secure the immigration benefit of naturalization").  The falsity of his statements having been established, Saleh must prove that these false statements were made for some purpose other than obtaining immigration benefits.  But he points to no record evidence of—or even specifies—any alternate reason.  The Court concludes that the purpose of the false testimony was to obtain immigration benefits.

As a last resort, Saleh argues that there are no false statements because during his N-336 appeal hearing in September 2021 he made a voluntary retraction of all incorrect information.  But a retraction made in response to the denial of an application does not negate the prior false statements made on wholly separate applications.  This argument is rejected.

Because no reasonable factfinder could conclude that Saleh met his burden of proving "good moral character," the Court will grant respondents' summary judgment motions.  The Court need not address respondents' alternative ground for denial of the application, that Saleh was not lawfully admitted.  See Chan, 464 F.3d at 296 (concluding that "statutory bar to establishing good moral character makes summary judgment appropriate").

The section 1421(c) claim will be dismissed.

IV.    <u>Plaintiff's APA claim will be denied as duplicative.</u>

Saleh's also brings a claim for violation of the Administrative Procedure Act, ("APA"), 5 U.S.C. § 701 <u>et</u> <u>seq.</u>, for the same failure by USCIS to approve his naturalization application.  Respondents argue that an APA claim is improper here because Saleh already has an alternative remedy in section 1421(c).

The APA provides for judicial review of any "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  As discussed above, section 1421(c) already provides for de novo judicial review of the denial of an application for naturalization and is unusually broad in the scope of review it provides.  This review is a "adequate remedy" for the alleged violations of which Saleh complains.  <u>See</u> 8 U.S.C. § 1421(c) (authorizing review "in accordance with chapter 7 of title 5 [the APA]").  Congress did not intend APA review "to duplicate existing procedures for review of agency action."  <u>Bowen v. Massachusetts</u>, 487 U.S. 879, 903 (1988); <u>see</u> <u>Escaler v. USCIS</u>, 582 F.3d 288, 291 n.1 (2d Cir. 2009) ("Nor have we been informed as to what judicial relief the APA might authorize that adds to the sweeping <u>de</u> <u>novo</u> review provided by Section 1421(c).").  Because there is an adequate remedy available, this Court does not have jurisdiction over Saleh's APA claim.  <u>See</u> <u>Li v. Garland</u>, 21 Civ. 10601 (LJL), 2022 WL 17095250, at *14 (S.D.N.Y. Nov. 21, 2022); <u>Kaibanda</u>, 2022 WL 2195345, at *8 n.8.  The APA claim will be dismissed.

CONCLUSION

Saleh is ineligible for naturalization under his 2016 N-400 application because by statute he has not proven his good moral character.  Saleh's motion for summary judgment is DENIED, and respondents' cross-motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to amend the caption (see footnote 1),

terminate the motions (ECF 32 & 36), enter final judgment for respondents, and close the case.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
        September 1, 2023